NOT FOR PUBLICATION                                            (Document No. 46)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

|  |  |
|---|---|
| ANDREW J. INCORVATI, | : |
| Plaintiff, | : Civil No. 10-1939 (RBK/KMW) |
| v. | : **OPINION** |
| BEST BUY COMPANY, INC., BEST BUY STORES, L.P., | : |
| Defendants. | : |

**KUGLER**, United States District Judge:

This matter arises out of Plaintiff Andrew Incorvati's ("Plaintiff") claims of Family and Medical Leave Act ("FMLA") retaliation and of age discrimination by his former employer, Best Buy ("Defendant"). Currently before the Court is Defendant's motion for summary judgment (Doc. No. 41). For the reasons stated herein, the Court finds that Plaintiff has failed to offer evidence in support of his FMLA claim that would create a genuine dispute of material fact for trial. On the other hand, the Court finds that just enough evidence exists to sustain Plaintiff's age discrimination claim. Accordingly, the Court will grant in part and deny in part Defendant's motion.

**I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

---

[1] When considering a defendant's motion for summary judgment, the Court views the facts underlying the claims in the light most favorable to the plaintiff. *See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993).

Plaintiff began his employment with Defendant in January 2005, working out of the company's Elkridge, Maryland location. Def.'s SUMF ¶ 10.[2] In March 2006, he was promoted to "in-home" television team lead in Defendant's Perth Amboy, New Jersey Service Center. *Id.* ¶ 11. In this capacity, Plaintiff, using a company-provided vehicle, traveled to Defendant's customer's homes to diagnose and repair televisions. *Id.*

About two years later, in July 2008, Plaintiff accepted a position as a Service Center Television Team Lead. Plaintiff still made occasional trips to customers' homes, but spent the vast majority of his time supervising employees at the service center and engaging in other technical aspects of television repair. Pl.'s Dep. 72-75. Upon starting in this new position, Plaintiff served as Television Team co-Lead with his co-worker Lisa Scorse. Def.'s SUMF ¶ 18. As co-Leads, Plaintiff focused on the technical aspects of the job, while Ms. Scorse handled the position's supervisory and administrative aspects. *Id.* ¶ 20. Both Plaintiff's and Ms. Scorse's direct superior was Service Center Tech Manager Hassan Ayoubi. *Id.* ¶ 19.

On November 9, 2008, Ms. Scorse was transferred to another department within the Company, leaving Plaintiff as the sole Television Team Lead. Then, on December 20, 2008 Plaintiff suffered a heart attack. *Id.* ¶ 24. Defendant granted his request for leave under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. *Id.*, Exh. L. During Plaintiff's absence from work, Defendant moved Mark Bahadur, who was at the time the Team Lead for appliances, to serve as Television Team Lead. *Id.* ¶ 26. Mr. Bahadur is seventeen years younger than Plaintiff. *See* Pl.'s Opp. Br. 3

Plaintiff's leave lasted until January 19, 2009, at which point he returned to his position as Television Team Lead. Because the Service Center was particularly busy in the post-holiday

---

[2] Any references in this Opinion to Defendant's Statement of Undisputed Material Facts ("SUMF") are limited to those assertions to which Plaintiff has specifically admitted.

season, Mr. Bahadur remained as a Television Team co-Lead.[3] Dep. of Hassan Ayoubi 21. Although both men technically held the same position, however, Plaintiff felt upon his return that his role in the Service Center had been diminished. *See* Pl.'s Dep. 181. For example, he no longer had access to a company vehicle, EZ Pass, and fuel card. *Id.* at 160. In addition, at certain times Plaintiff would attempt to set the television technician team's goals and objectives, but Mr. Bahadur, with the apparent help of Mr. Ayoubi, would countermand these orders. *Id.* at 174.

Notwithstanding these feelings of marginalization, Plaintiff still performed many of the same tasks as he had before taking leave, including providing guidance to the service technicians, attending to matters in the stockroom, and consulting on specific television repair jobs. *Id.* at 182. In addition, he conducted periodic reviews for individual technicians, and, as necessary, disciplined subordinates for violating Defendant's workplace policies. *Id.* at 184-85. Still, Plaintiff reported that on at least two occasions, he asked his technicians to perform certain tasks, and those tasks went unfulfilled. *Id.* at 160-62.

In the weeks following Plaintiff's return, it became clear that Plaintiff and Mr. Bahadur did not get along well. Def.'s SUMF ¶ 32. For instance, Mr. Bahadur often joked about Plaintiff's age and health. Pl.'s Dep. at 169. On one occasion, Mr. Bahadur printed out and handed to Plaintiff a picture of a "Hoveround" motorized wheelchair with the caption, "you

---

[3] The record provided to the Court is unclear as to exactly what title Mr. Bahadur held during the relevant times. It appears undisputed that Mr. Bahadur became Television Team Lead during the time Plaintiff was away on medical leave. Pl.'s Dep. 98-99; Ayoubi Dep. 21. It is likewise clear that Mr. Bahadur remained in the Television Team Lead position along with Plaintiff after Plaintiff's return in January 2009. Pl.'s Dep. 99-100; Ayoubi Dep. 21. During this period, from January 2009 until Plaintiff's termination in April 2009, both men acted as Television Team Co-leads, with neither having supervisory powers over the other. Pl.'s Dep. 99-100. However, Hassan Ayoubi, Plaintiff's manager in the Service Center did answer "yes," when asked the question, "[Mark Bahadur] wasn't a team leader until [Plaintiff] was terminated, correct?". Ayoubi Dep. 111. Likewise, he stated that, "once Mr. Incorvati left, Mark [Bahadur] took over his position." *Id.* at 27. Finally, he answered yes to the question, "Once Mr. Incorvati was terminated, you moved Bahadur to the TV lead tech . . ., correct?". *Id.* at 107. Thus, there is evidence suggesting that Plaintiff was replaced by Mr. Bahadur.

could use one of these." Pl.'s Dep. at 169. When Plaintiff complained about this action to his superior Mr. Ayoubi, Mr. Ayoubi chuckled. *Id.* at 78-80. In addition, there were reports that Plaintiff had treated his subordinate technicians poorly on several occasions, prompting Plaintiff's superiors Mr. Ayoubi and a Mr. Fred Comer, the manager of the Service Center, to meet with him regarding his workplace conduct. *Id.* ¶¶ 35-39. Consequently, Mr. Ayoubi contacted Accenture, a company which provided third-party Human Resources services for Defendant, and, after recounting some of Plaintiff's inappropriate conduct, recommended that he be placed on a Final Warning. On March 24, 2009, after meeting with Mr. Ayoubi and Mr. Comer, Plaintiff was placed on a Final Warning for " [t]he creation of a disrespectful and demeaning work environment with the usage of inappropriate comments and corresponding behaviors to employees," including the use of profanity directed at employees. *Id.* at Exh. R (Plaintiff's Performance Counseling Record). Plaintiff understood a Final Warning to mean that another similar workplace conduct violation would result in his employment being terminated. Pl.'s Dep. at 113.

On April 2, 2009, as part of a yearly review, Plaintiff self-rated his respect for the values of showing "Respect, Humility, and Integrity," on a scale of 1 to 5 with 1 being the lowest rating, as a 1. Def.'s SUMF ¶¶ 46-47. On that same day, Mr. Ayoubi came across certain printed-out emails between Plaintiff and his one-time Television Team co-Lead, Ms. Scorse. These emails contained vulgar language insulting Plaintiff's new co-lead, Mr. Bahadur. Def.'s SUMF ¶¶ 49-53. Mr. Ayoubi passed the emails on to his managers, who in turn contacted Accenture Human resources for a discipline recommendation as to both employees. Def.'s SUMF, Exh. W (Accenture Siebel Notes). Mr. Ayoubi recommended to Mr. Comer that Plaintiff be terminated. Ayoubi Dep. 30-31. After conferring with Accenture, on April 14, 2009, Mr. Comer and other

4

senior managers in the Service Department made the decision to terminate both Plaintiff and Ms. Scorse. *Id.* ¶ 59. Specifically, Plaintiff was found to have violated Defendant's workplace policies requiring him to "(a) show respect, humility and integrity; (b) . . . not misuse electronic data; and (c) not engage in any other behavior not consistent with Company values or that negatively impacts the work environment at Best Buy." *Id.* ¶ 60. With Plaintiff's employment terminated, Mr. Bahadur became the sole Television Team Lead for Defendant's Perth Amboy, NJ Service Center.

On April 16, 2010, Plaintiff filed suit in this Court (Doc. No. 1).[4] Shortly thereafter, Defendant filed a motion to dismiss the Complaint for failure to state a claim upon which relief could be granted (Doc. No. 4). The Court granted the motion in part, dismissing all but two of Plaintiff's claims for relief. Plaintiff's first remaining claim alleges that Defendant discriminated against him because of his decision after his heart attack to take unpaid leave pursuant to the federal Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* Compl., First Count. Specifically, Plaintiff alleges that his perceived marginalization as Television Team co-Lead, as well as the eventual termination of his employment in April 2009, were based, "in determinative part, upon Plaintiff's exercise of his rights provided by the FMLA." *Id.* The other remaining count alleges that Defendant's decision to terminate Plaintiff's employment was also based on Plaintiff's age, thereby constituting willful and intentional discrimination in violation of the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1 *et seq.* Compl., Third Count.

---

[4] Plaintiff's Complaint originally included seven counts. The Court, in an opinion and order dated November 16, 2010, dismissed Plaintiff's claims alleging retaliation, perceived discrimination, aider and abettor liability, and hostile work environment under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et seq.* (Doc. Nos. 9-10). It also dismissed Plaintiff's wife's claim for loss of consortium. *Id.* Consequently, Defendant's motion for summary judgment is directed at Plaintiff's FMLA retaliation claim (First Count), NJLAD age discrimination claim (Third Count), and a his prayer for punitive damages (Seventh Count).

In October 2012, Defendant filed the instant motion for summary judgment on Plaintiff's (Doc. No. 46). The crux of Defendant's motion is that Plaintiff has failed to offer facts in support of either of his remaining claims, such that no genuine dispute of material fact exists that would warrant a trial. After a brief recitation of the proper legal standard governing a motion for summary judgment, the Court will examine each of Plaintiff's claims in turn.

## II. LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish

the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 Fed. Appx. 353, 354 (3d Cir. Sept. 17, 2007) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder, not the district court. *BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

### A. FMLA Retaliation

Where, as here, a plaintiff seeks to establish an FMLA retaliation claim through the use of circumstantial evidence, the Court assesses the plaintiff's case using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Lichtenstein v. University of Pittsburgh Medical Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012).

Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing a prima facie case of FMLA discrimination. *See Naber v. Dover Healthcare Assocs., Inc.*, 473 Fed. App'x 157, 159-60 (3d Cir. Apr. 2, 2012). Doing so creates a rebuttable presumption that the employer unlawfully discriminated against him. *Thurston v. Cherry Hill Triplex*, --- F. Supp. 2d ---, 2008 WL 9374284 at *9 (D.N.J. Aug. 5, 2008). Consequently, upon the plaintiff establishing his prima facie case, the burden shifts to the defendant "to articulate a

7

legitimate, nondiscriminatory reason for its adverse employment action." *Id.* (quoting *Bearley v. Friendly Ice Cream Corp.*, 322 F. Supp. 2d 563, 571 (M.D. Pa. 2004)). If the defendant employer can offer such a reason, the presumption of unlawful discrimination falls away, and the burden shifts back to the plaintiff, who must show that the employer's proffered reason was simply a pretext for retaliatory animus owing to the plaintiff's decision to take FMLA leave. *Thurston*, 2008 WL 9374284 at *9.

Prevailing on an FMLA retaliation claim requires the plaintiff to prove three things: (1) that he invoked his right to FMLA-qualifying leave; (2) that he suffered an adverse employment decision; (3) that there is a causal relationship between the leave request and the adverse action. *Lichtenstein v. University of Pittsburgh Medical Ctr.*, 691 F.3d 294, 301-02 (3d Cir. 2012).

As to the second element of the prima facie case for FMLA retaliation, an adverse employment decision must be a "materially adverse" one, meaning that it "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).[5] Such a standard does not encompass the mere "petty slights, minor annoyances, and simple lack of good manners" attendant to virtually all workplaces, because such circumstances cannot be expected to deter employees from exercising their FMLA rights. *See Burlington Northern*, 548 U.S. at 68. Instead, the Court, adopting the perspective of

---

[5] It bears mention that the United States Supreme Court in *Burlington Northern* developed this standard in the context of a retaliation claim asserted under the anti-discrimination provisions in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), and not under the FMLA. While the Third Circuit has never squarely held that this "materially adverse" standard applies in the context of an FMLA retaliation claim, it has suggested that, were it necessary to address the issue, it would so hold. *See Kasper v. County of Bucks*, No. 12-2504, 2013 WL 563342 at *5 (3d Cir. Feb. 15, 2013) (assuming, "*arguendo*, that the *Burlington Northern* standard applies in the FMLA context); *DiCampli v. Korman Communities*, 257 Fed. App'x 497, 500-01 (3d Cir. 2007) (applying the *Burlington Northern* standard to an FMLA claim without further discussion). At least five other circuit courts of appeals have reached this conclusion. *Millea v. Metro-North R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011); *Metzler v. Fed. Home Loan bank of Topeka*, 464 F.3d 1164, 1171 n.2 (10th Cir. 2006); *McArdle v. Dell Products, L.P.*, 293 Fed. App'x 331, 337 (5th Cir. 2008); *Csicsmann v.* Sallada, 211 Fed. App'x 163, 168 (4th Cir. 2006); *Foshee v. Ascension Health-IS, Inc.*, 384 Fed. App'x 890, 891 (11th Cir. 2010) (assuming without deciding that the *Burlington Northern* standard applies in the FMLA context). The Court will likewise apply this standard in the present context.

a reasonable person in the plaintiff's position, must consider all the circumstances of the particular case to determine whether this element has been satisfied. *See Culler v. Shinseki*, 840 F. Supp. 2d 838, 846 (M.D. Pa. 2011) (citing *Burlington Northern*, 548 U.S. at 71).

With respect to the third element of the prima facie case, establishing a causal relationship between the decision to take FMLA leave and the adverse employment decision necessarily requires proof of retaliatory intent by the employer. Retaliation need not be the sole reason motivating the adverse employment decision; rather, it will suffice for the plaintiff to show that the retaliatory animus was "a determinative factor," meaning in essence that "the action would not have been taken but for [the] protected activity." *Culler v. Shinseki*, 840 F. Supp. 2d 838, 846 (D.N.J. 2011) (citing *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 231-32 (3d Cir. 2007)).[6] Stated another way, the court's inquiry is whether the proffered evidence "suffices to raise the inference" that the plaintiff's request for FMLA leave was causally related to the adverse employment action in question. *See LeBoon*, 503 F.3d at 232.

The Third Circuit has noted that there are two main methods of raising such an inference. *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001). First, where there exists "unusually suggestive" timing between the leave request and the adverse

---

[6] The *Culler* court freely relies on cases like *LeBoon* to inform its FMLA retaliation claim prima facie analysis, even though the plaintiff in *LeBoon* was asserting a retaliation claim not under the FMLA but rather under Title VII of the Civil Rights Act. *LeBoon*, 503 F.3d at 231. Indeed, numerous district courts in this Circuit have observed that the Third Circuit's decisions involving claims of retaliation under Title VII, the Americans with Disabilities Act, and the Age Discrimination in Employment Act provide "helpful guidance" in the FMLA context. *E.g.*, *Chapman v. UPMC Health System*, 516 F. Supp. 2d 506, 523-24 (W.D. Pa. 2007); *Grosso v. Federal Exp. Corp.*, 467 F. Supp. 2d 449, 459 (E.D. Pa. 2006); *Collier v. Target Stores Corp.*, No. 03-1144, 2005 WL 850855 at *7 (D. Del. Apr. 13, 2005). While the Third Circuit has never explicitly approved of this borrowing practice, its endorsement of this approach can be inferred based on its own FMLA analyses. *See, e.g.*, *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (discussing the causation element in the FMLA retaliation prima facie case and explaining the concept by reference to its Title VII discrimination precedents) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279-81 (3d Cir. 2000) and *LeBoon*, 503 F.3d at 232); *Schofield v. Metropolitan Life Ins. Co.*, 252 Fed. App'x 500, 504 (3d Cir. 2007) (employing the same practice by reference to Title VII and ADA discrimination precedents) (citing *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001) (Title VII) and *Williams v. Phila. Housing Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (ADA). The Court will adhere to this practice in the instant matter.

employment action, such circumstance may be sufficient to establish causation. *Lamarca v. Verizon Pa., Inc.*, No. 09-203, 2010 WL 2044627 at *9 (W.D. Pa. may 20, 2010) (citing *LeBoon*, 503 F.3d at 232). Second, causation may be established based on a period of "intervening antagonism." *LeBoon*, 503 F.3d at 232. To make this determination, courts consider "a broad array of evidence." Importantly, it is incumbent upon the employee to demonstrate that the antagonistic behavior began after the FMLA request was made. *Compare Randler v. Kountry Kraft Kitchens*, No. 11-474, 2012 WL 6561510 at *12 (M.D. Pa. Dec. 17, 2012) (rejecting plaintiff's causation argument in part because the alleged antagonistic behavior towards plaintiff, taking the form of "jokes and remarks," was "not markedly different from the incidents [the plaintiff] experienced prior to her" engaging in protected activity) *with Abramson*, 260 F.3d at 289 (crediting plaintiff's evidence of ongoing antagonism in light of evidence of plaintiff's superior's "change in demeanor *after* [plaintiff engaged in protected activity]") (emphasis added). Finally, in addition to these two primary methods, inconsistencies or discrepancies in the employer's articulated reasons for terminating the employee may be sufficient to support an inference of causation. *LeBoon*, 503 F.3d at 232; *Abramson*, 260 F.3d at 290. *Id.* When considering any circumstantial evidence of causation, the Court is to lend "a careful eye to the specific facts and circumstances encountered." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000); *see also Robinson v. Southeastern Pennsylvania Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 895 (3d Cir. 1993) (deeming trial court's finding of a causal link not to be clearly erroneous when evidence was presented that the plaintiff was subjected to "a constant barrage of written and verbal warnings . . ., inaccurate point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge") (Title VII discrimination case); *Marra v. Philadelphia Housing Auth.*, 497 F.3d 286,

304-05 (finding causation based on pattern of antagonism when, after engaging in protected activity, plaintiff's computer was vandalized and never adequately investigated, plaintiff was excluded from an important meeting, one of his subordinates was assigned away from him against his will, and plaintiff's superior gave him a look of disgust upon learning of his participation in the protected activity).

An employer's burden to offer a legitimate non-discriminatory reason for taking the adverse employment action with respect to the employee is a relatively light one. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994); *see also Constant v. Mellon Financial Corp.*, 247 Fed. App'x 332, 337 (3d Cir. 2007) (citing *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)) (describing the employer's burden to adduce a legitimate nondiscriminatory reason as being "one of production, not persuasion").

Once the employer has done so, the employee must establish pretext by offering evidence from which a reasonable factfinder could either "(1) mistrust the employer's articulated genuine reasons; or (2) believe that a discriminatory reason was likely a motivating or determinative factor of the employer's action." *Moore v. City of Camden*, No. 10-3044, 2013 WL 1903300 at *5 (D.N.J. May 7, 2013) (citing *Naber v. Dover Healthcare Assocs. Inc.*, 473 Fed. App'x 157, 160 (3d Cir. 2012). Stated another way, the employee must show that *each* proffered legitimate non-discriminatory reason was either a "*post hoc* fabrication or otherwise did not actually motivate the employment action . . . ." *Fuentes*, 32 F.3d at 764 (italics in original). A plaintiff does this not by showing that the employer's decision was "wrong or mistaken," but rather that the reasons for that decision admit of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" such that a reasonable factfinder could find them "unworthy of credence." *Id.*

11

In this case, there is no dispute that Plaintiff requested and took FMLA leave, thereby satisfying the first element of his prima facie case. With regard to the second element, Plaintiff, although his motion papers do not make it abundantly clear, can be understood to be presenting two adverse employment actions: first, the taking away of his company-furnished service vehicle (along with the accompanying gas card and EZ-Pass), and second, his termination of employment. The Court will now address both theories.

     i.  *Adverse employment action: loss of company vehicle*

It is undisputed that when Plaintiff returned from FMLA leave, he lost access to the vehicle, gas card, and EZ-Pass that Defendant had previously provided him. Pl.'s Dep. at 160; Def.'s Reply Br. in Support of S.J. 11. The loss of this kind of workplace benefit can be considered a "materially adverse" employment action under *Burlington Northern*. *Accord Diaz v. Miami Dade County*, No. 09-21856, 2010 WL 3927751 at *7 (S.D. Fla. Aug. 17, 2010) (concluding that plaintiff had established triable issue of fact on material adverse employment action where, in addition to other changes in his job, he lost the use of his take-home vehicle). Finally, because the loss of this benefit occurred directly upon Plaintiff's return from FMLA leave, there exists the "unusually suggestive timing" that permits the inference of causation. *See Lamarca*, 2010 WL 2044627 at *9. Thus, Plaintiff has stated a prima facie case of FMLA retaliation.

In response, Defendant offers a compelling legitimate nondiscriminatory reason for taking away Plaintiff's vehicle. Plaintiff admitted that he retained access to a company vehicle after he was promoted to service center team lead only because he agreed to perform some in-home service on an occasional basis. Pl.'s Dep. 66. He acknowledged that no other service center team lead had a company vehicle. *Id.* Defendant maintains that the only reason it ceased

12

to provide Plaintiff with a company vehicle was that he was no longer going to go out on service calls after returning from FMLA leave. Ayoubi Dep. 53. Indeed, Plaintiff admitted that, had he been asked to perform in home service after his return to work, he would have refused it. Pl.'s Dep. 67-68.

Plaintiff cannot offer any persuasive evidence that Defendant's proffered reason for taking away Plaintiff's company vehicle was pretextual. There are no inconsistencies in Defendant's explanation for this decision. Simply stated, there is nothing in the record that would lead a reasonable factfinder either to "mistrust" Defendant's articulated reasons for taking away Plaintiff's vehicle or to "believe that a discriminatory reason was likely a motivating or determinative factor" in that action. *See Moore v. City of Camden*, No. 10-3044, 2013 WL 1903300 at *5 (D.N.J. May 7, 2013). Thus, Plaintiff's FMLA retaliation claim cannot survive summary judgment on this basis.

  *ii.* *Adverse employment action: termination of employment*

In the alternative, Plaintiff alleges that taking FMLA leave resulted in the termination of his employment with Defendant. Under this theory, it is clear that he has alleged a qualifying adverse employment action. Unfortunately for Plaintiff, however, his claim suffers from serious deficiencies that render summary judgment in Defendant's favor appropriate.

First, although he successfully establishes the first two elements of a prima facie FMLA retaliation claim, Plaintiff offers scant evidence of a causal link between his taking leave and his ultimate termination. Because Plaintiff returned from FMLA leave on January 19, 2009 and was not terminated until April 14, 2009, about three months later, there exists no "unusually suggestive" timing between the two events that would suffice to establish the causation element. *See LeBoon*, 503 F.3d at 233 ("Although there is no bright line rule as to what constitutes unduly

suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment.").

Instead, Plaintiff must attempt to establish a pattern of ongoing antagonism that began after he requested and took FMLA leave and continued up until the time of his termination. *See id.* at 232. To satisfy this burden, Plaintiff offers the following evidence:

- Upon his return to work after taking FMLA leave, he was forced to work as a co-lead in the Television Department, rather than running the department by himself. Ayoubi Dep. 21.
- Upon his return, Plaintiff lost the use of his company vehicle, gas card, and EZ Pass.
- At times, when he tried to set goals and objectives for his team, his co-team lead, with the help of their supervisor, would change those goals and objectives. Pl.'s Dep. 174.
- His co-team lead printed out a picture of a Hoveraround chair and used it as part of a joke at Plaintiff's expense. *Id.* at 169.
- Plaintiff's superior "chuckled" when presented with a copy of the Hoveraround email. *Id.* at 78-80.

Even viewing this evidence in the light most favorable to the Plaintiff, the Court finds that Plaintiff has failed to establish the causal link necessary to sustain his FMLA retaliation claim. While it is true that Plaintiff worked as a co-team lead after his return from FMLA leave, he acknowledged that he had worked in the same arrangement previously. Pl.'s Dep. 75-76. Thus, to the extent it could even be considered "antagonistic" for management to place Plaintiff in a co-lead position, it had taken such action prior to Plaintiff's taking FMLA leave. As a result, Plaintiff's co-lead status cannot help to establish causation a part of a pattern of ongoing antagonism, because it is not "new" behavior that began only after Plaintiff engaged in protected activity. *See Randler*, 2012 WL 6561510 at *12.

The Hoveround email has limited value. The email originated with one of Plaintiff's co-workers, not a superior, so there is no basis to impute this single act by a non-supervisor to the motives of the Defendant company in terminating Plaintiff's employment. *Accord Ellison v.*

14

*Oaks 422 LLC*, No. 11-2943, 2012 WL 876723 at *7 (E.D. Pa. Mar. 15, 2012) ("Animosity from coworkers cannot constitute retaliation because coworkers do not have any authority to carry out an adverse employment action.") (citing *Jensen v. Potter*, 435 F.3d 444, 452 (3d Cir. 2006)). To the extent that Mr. Ayoubi's chuckling upon being presented with the email can be understood as an adoption by plaintiff's supervisor of the sentiment implied by the email, such evidence is not particularly probative to show a *pattern* of antagonism where, as here, Mr. Ayoubi's actions amounted to a "stray remark, unconnected with and remote from the decision-making process which resulted in [Plaintiff's] discharge." *See Calero v. Cardone Indus., Inc.*, at *8 (E.D. Pa. June 29, 2012) (citing *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 333 (3d Cir. 1995)). Generally, one single such event does not constitute harassment or antagonism. *McCormick v. Allegheny Valley School*, No. 06-3332, 2008 WL 355617 at *18 (E.D. Pa. Feb. 6, 2008).

Next, for the reasons discussed in the above subsection, because Defendant had a legitimate nondiscriminatory reason for taking away Plaintiff's company vehicle, and because Plaintiff cannot offer evidence to show that that the proffered reasons for this decision were pretextual, he cannot rely on the loss of his vehicle to establish a pattern of intervening antagonism for purposes of establishing causation on his FMLA claim.

Accordingly, Plaintiff's relevant evidence to establish causation is limited to the Hoveround email and his deposition testimony that from time to time his team goals and objectives were countermanded by his co-team lead. Simply stated, this is not enough to establish the causal link necessary to sustain an FMLA retaliation claim. Because Plaintiff has failed to establish his prima facie case, the Court need go no further in its *McDonnell Douglas* analysis, and will grant summary judgment on this claim in Defendant's favor.

**B.      Age Discrimination**

The New Jersey Law Against Discrimination ("NJLAD") prohibits an employer from discrimination in the "terms conditions, or privileges of employment" on the basis of, among other things, a person's age. N.J.S.A § 10:5-12(a). The contours of an NJLAD age discrimination claim are strongly informed, though not inexorably resolved, by reference to federal substantive and procedural rules in the Title VII context. *Hernandez v. Federal Express*, No. 06-4745, 2008 WL 163642 at *3 (D.N.J. Jan. 16, 2008) (citing *Gerety v. Atlantic City Hilton Casino Resort*, 184 N.J. 391, 398 (2005)); *accord Bergen Comm. Bank v. Sisler*, 723 A.2d 944, 954 (N.J. 1999) ("To the extent the federal standards [for age discrimination] are 'useful and fair,' they will be applied in the interest of achieving uniformity in the discrimination laws.") Accordingly, when a claimant seeks to establish discriminatory employment actions through the use of circumstantial evidence, the Court applies the three step *McDonnell Douglas* burden shifting framework. *Sisler*, 723 A.2d at 954. When conducting this analysis, the Court is mindful that the plaintiff's burden, in its essence, is to show that his age "played a role in the employer's decisionmaking process and had a determinative influence on the outcome of that process." *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 300 (3d Cir. 2004)).

As the second and third steps of the *McDonnell Douglas* analysis are identical in the FMLA retaliation context as in the NJLAD age discrimination context, the Court need not reiterate the those legal standards as they are set forth in Part III.A. of this Opinion. It is necessary, however, to consider the first step. To state a prima facie cause of action under the NJLAD, Plaintiff must demonstrate that (1) he belongs to a protected class, (2) his job performance met his employer's legitimate expectations, and (3) he suffered an adverse employment action. Finally, the plaintiff must establish a fourth element, which may take

different forms depending on the circumstances underlying his claim: that is, he must show either that he was *replaced* by someone sufficiently younger as to permit an inference of age discrimination, *Anderson v. Thermo Fisher Scientific*, 11-3394, 2013 WL 1222738 at *3 (D.N.J. Mar. 25, 2013), or that his employer "*retained* someone similarly situated to him who was sufficiently younger." *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 305 (3d Cir. 2004) (emphasis added).

In this case, Defendant, for purposes of the instant motion, concedes that Plaintiff has established the first three elements of his prima facie case. Def.'s Br. 6 n.2. However, Defendant argues forcefully that Plaintiff has failed to establish the fourth element. *Id.* at 6-7. Defendant explains that right before his termination, Plaintiff was serving as co-team lead in the Television Department along with Mark Bahadur. After Plaintiff's termination, Mr. Bahadur remained in his position, but Defendant did not hire anyone to take over for Plaintiff, thereby leaving Mr. Bahadur as the sole television team lead. Thus, Defendant argues, Plaintiff was not actually "replaced" by anyone sufficiently younger, and therefore has failed to establish his prima facie case.

The Court cannot accept this argument for several reasons. First, the Court is mindful of the statements of Plaintiff's manager Mr. Ayoubi, recounted in some details in footnote 3 above, indicating that Mr. Bahadur took over Plaintiff's position after Plaintiff was terminated. Taken together, and viewed in the light most favorable to the nonmoving party, they amount to an admission by Defendant's representative that in fact Plaintiff was replaced by Mr. Bahadur. Second, Plaintiff need not necessarily show that he was actually replaced by a younger person in order to sustain an NJLAD age discrimination claim if he can show that his employer *retained* a similarly situated younger employee. *See Monaco*, 359 F.3d at 305 (describing the "reduction in

force" theory of age discrimination under the NJLAD). There can be no doubt that as "co-team leads," Plaintiff and Mark Bahadur appear to have had the same "job function, level of supervisory responsibility and salary," which would render them "similarly situated" employees. *See id.* Thus, because Mark Bahadur remained in his position after Plaintiff was terminated, and because Mr. Bahadur is seventeen years younger than Plaintiff, s*ee* Pl.'s Opp. Br. 3, the Court finds that Plaintiff has met his burden of establishing the elements of his prima facie case of age discrimination because he has offered evidence showing that, among other things, he was terminated from his position while his employer "retained someone similarly situated to him who was sufficiently younger." *See Monaco*, 359 F.3d at 305.

The Court therefore proceeds to the second stage of *McDonnell Douglas*. In this case, there is no doubt that Defendant has offered a legitimate non-discriminatory reason for terminating Plaintiff's employment: it had placed Plaintiff on a Final Warning for inappropriate workplace conduct towards his fellow employees, and subsequently found a string of crass emails Plaintiff wrote disparaging his co-worker Mr. Bahadur. Def.'s SUMF ¶¶ 49-53. The decision was then made to terminate Plaintiff's employment for violation of his Final Warning after consultation with a third-party human resources consultant. *Id.* ¶¶ 55-59.

Accordingly, the burden shifts back to Plaintiff, who must offer evidence evidence from which a reasonable factfinder could either "(1) mistrust the employer's articulated genuine reasons; or (2) believe that a discriminatory reason was likely a motivating or determinative factor of the employer's action." *Moore v. City of Camden*, No. 10-3044, 2013 WL 1903300 at *5 (D.N.J. May 7, 2013) (citing *Naber v. Dover Healthcare Assocs. Inc.*, 473 Fed. App'x 157, 160 (3d Cir. 2012). Here, Plaintiff's Opposition Brief makes reference to inconsistencies in the explanation for how Plaintiff's disparaging emails were discovered by his manager Mr. Ayoubi.

18

It also emphasizes the fact that Plaintiff was asked to sign an acknowledgement of Defendant's human resource policies and Code of Business Ethics days before his termination, which his human resources manager then backdated to suggest that the forms had been signed when Plaintiff began his employment with the company in 2005. Pl.'s Opp. Br. 6-7. The Court finds this evidence to be of little relevance to the question of pretext.

More persuasive, however, is Plaintiff's testimony regarding the Hoveround email. Mr. Bahadur emailed Plaintiff a picture of a Hoveround wheelchair that included the caption, "you could use one of these." Pl.'s Dep. 78. Plaintiff, apparently offended by his coworker's making fun of him for being old and weak, forwarded the email to his manager Mr. Ayoubi. Upon receiving the email, Mr. Ayoubi "laughed at it and did nothing about it." *Id.* This amounts to an adoption of a disparaging statement about Plaintiff's age by an individual who contributed in the decision to terminate Plaintiff's employment.[7] Accordingly, the Court finds that Plaintiff has offered *just* enough evidence from which a reasonable factfinder could "mistrust the employer's articulated genuine reason" for terminating Plaintiff's employment. For these reasons, the Court will deny Defendant's motion for summary judgment.

## C.  Prayer for Punitive Damages

Finally, Defendant asks the Court to strike Plaintiff's prayer for punitive damages. Def.'s Br. in Support of S.J. 18-20. Although it has very serious doubts whether Plaintiff has alleged sufficient facts to give rise to an award of punitive damages under the NJLAD, the Court nevertheless finds that ruling on this issue at the summary judgment stage would be premature.

---

[7] Mr. Ayoubi admitted that he was involved in the investigation into Plaintiff's emails about Mr. Bahadur that led to Plaintiff's termination. Ayoubi Dep. 83. Thus, even if Mr. Ayoubi was not the person who acted as the ultimate decision-maker on the question of whether to terminate Plaintiff, his conduct can suffice to establish Defendant's liability for discrimination if he exercised influence over those decision-makers. *See Battaglia v. United Parcel Serv., Inc.*, No. L-10341-06, 2011 WL 3516925 at *10 (N.J. App. Div. Aug. 12, 2011) (discussing this so called "cat's paw" theory of liability recently reaffirmed by the United States Supreme Court in *Staub v. Proctor Hosp.*, --- U.S. ---, 131 S. Ct. 1186, 1189 (2011)).

19

Instead, it will decide whether to instruct the jury on punitive damages after trial in this matter gets underway. Thus, it will deny Defendant's motion for summary judgment on this issue without prejudice.

## IV. CONCLUSION

For the reasons stated above, the Court will grant Defendant summary judgment on Plaintiff's FMLA retaliation claim and will deny Defendant summary judgment on Plaintiff's NJLAD age discrimination claim. It will also deny without prejudice Defendant's motion for summary judgment on Plaintiff's prayer for punitive damages. An appropriate order shall issue today.


Dated: 6/27/2013                                          /s/ Robert B. Kugler
                                                         ROBERT B. KUGLER
                                                         United States District Judge